**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SPIROS BARBARIGOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 17 C 3234** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Spiros Barbarigos ("Plaintiff") seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff moved for summary judgment seeking reversal or remand, while the Commissioner filed a cross-motion for summary judgment seeking affirmance of the decision. For the following reasons, the Court grants Plaintiff's motion, denies the Commissioner's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI and DIB, on March 7, 2013 and March 18, 2013, respectively, alleging that he became disabled on December 24, 2010 due to depression, severe back pain, lumbar spine impairment, and a herniated disc. (R. 171-81). The Social Security Administration denied Plaintiff's application initially on June 5, 2013, and again upon reconsideration on December 3, 2013. (R. 68-83, 86-105). Plaintiff then filed

a written request for a hearing and appeared before Administrative Law Judge Randolph E. Schum (the "ALJ") on June 23, 2015. (R. 48-65). The ALJ heard testimony from Plaintiff, who was represented by a non-attorney representative, and a vocational expert (the "VE"). Shortly thereafter, on August 18, 2015, the ALJ denied Plaintiff's claim for DIB and SSI benefits, finding that he can perform his past relevant work as a bartender, food service supervisor, and restaurant host. (R. 32-47). The Appeals Council denied Plaintiff's request for review on October 20, 2016, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 9-15).

In support of his request for reversal or remand, Plaintiff argues that the ALJ erred in weighing the opinion evidence from his treating physicians, failed to properly support his residual functional capacity ("RFC") assessment with medical evidence in the record, and failed to properly evaluate Plaintiff's statements regarding the severity of his symptoms. As discussed below, the Court finds that the ALJ did not properly weigh the opinion evidence in this case, the RFC determination is not supported by substantial evidence, and the ALJ failed to provide adequate support for his credibility finding. The case must therefore be remanded for further consideration of these issues.

## FACTUAL BACKGROUND[1]

Plaintiff was born in October 1960, making him 52 years old on the date last insured and 54 years old at the time of the ALJ's decision. (R. 180). He graduated from high school and completed a year and a half of college. (R. 51, 212). In the fifteen years prior to filing for disability, Plaintiff reported working as an airline baggage handler (August 1998 to February 1999), bartender (December 1999 to March 2001 and January 2008 to

---

[1] Consistent with Plaintiff's arguments for remand, this opinion focuses primarily on his back impairment.

February 2009), food service supervisor (May 2001 to November 2003 and February 2006 to September 2007), retail sales associate (October 2009 to March 2010), and truck driver (May 2010 to December 2010). (R. 227).

## A. Medical History

### 1. December 2010

On December 27, 2010, Plaintiff went to Scottsdale Healthcare-Osborn emergency room complaining of low back pain radiating to his right buttock and thigh with gradual onset two weeks prior. (R. 286). Plaintiff said that he had back pain for years, but his pain had become worse. (R. 280). Plaintiff told the nurse that he aggravated his lower back at work while getting in and out of his truck, opening the door, and pulling items in and out of the truck. (R. 286). Plaintiff reported no numbness, no motor weakness, no bowel or bladder incontinence, no abdominal pain, and no fever. (R. 280). On examination, the doctor noted tenderness to palpitation on the right sciatic notch. (R. 281). Plaintiff was discharged the same day with a diagnosis of back pain with sciatica. He was prescribed Flexeril, Percocet, prednisone and instructed to follow up with his primary care physician. (R. 281-82).

### 2. 2011

On January 3, 2011, Plaintiff saw Christin Gallo, D.O., at Scottsdale Primary Care. Plaintiff reported having surgery in 2003 due to a herniated lumbar disc. (R. 298). Plaintiff told Dr. Gallo that his back was fine until about eight months prior when he got a job as a truck driver. (*Id.*). He reported that his back pain had been worsening and radiated down his right leg to his knee. (*Id.*). He stated that the medications given to him recently in the emergency room were not helping. (*Id.*). During the physical exam, Dr. Gallo observed

a waddling gait, tenderness to palpation just inferior to the right posterior superior iliac spine, decreased range of motion in all directions of the lumbar spine, and positive straight leg raising on the right. (R. 300). Dr. Gallo diagnosed lumbago and right sciatica. (*Id.*). She instructed Plaintiff to continue taking Flexeril and Percocet, recommended Plaintiff have an MRI scan of his lumbar spine and referred him to physical therapy. (*Id.*).

Plaintiff had a lumbar spine MRI on January 11, 2011. (R. 291-92). The MRI showed "degenerative disc changes at L4-L5 with broad-based disc bulge and endplate remodeling slightly asymmetric to the right and resulting in some right-sided neural foraminal narrowing but no convincing evidence for nerve root impingement." (R. 292). There was also a "left lateral disc protrusion and annular tear at L3-4." (*Id.*). The radiologist noted that the protruding disc at L3-L4 approached but did not significantly impinge upon or displace the exited left L3 nerve root laterally. (*Id.*).

### 3. 2012

Plaintiff returned to Dr. Gallo's office on April 16, 2012 for medication refills and chest pain for the past two weeks. (R. 302). Plaintiff denied back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, or arthritis. (R. 303). On examination, Dr. Gallo made no abnormal musculoskeletal findings. (R. 304-05).

### 4. 2013

Almost a year later, on April 3, 2013, Plaintiff visited Dr. Gallo, complaining of back pain and to "get paperwork filled out for disability." (R. 307). Plaintiff told Dr. Gallo that his back pain was primarily on the right side of his back and radiated down both legs. (*Id.*). Plaintiff reported not taking any medication for his pain because he could not find anything that helped. (*Id.*). He stated his pain was a 9 out of 10 at the time of the visit

and ordinarily was a 7 to 8 out of 10. (*Id.*). Plaintiff also stated that he was sleeping only 4 hours at night and napping 1-2 hours during the day due to his pain. (*Id.*). Dr. Gallo's physical examination revealed tenderness to palpation just inferior to the right posterior superior iliac spine, decreased range of motion in all directions of the lumbar spine, and positive straight leg raising on the right. (R. 309). She diagnosed lumbago, sciatica, and herniated disc with an onset of April 3, 2013. (*Id.*). Dr. Gallo prescribed Gabapentin and asked Plaintiff to return in one year or as needed. (*Id.*).

On April 8, 2013, Dr. Gallo filled out a Multiple Impairment Questionnaire in support of Plaintiff's disability claim. (R. 264-71). She wrote that she had seen Plaintiff a few times per year since December 2010 and thought his prognosis was "poor." (R. 264). Dr. Gallo noted that Plaintiff had been diagnosed with herniated lumbar discs and lumbar radiculopathy. (*Id.*). She stated that Plaintiff has low back pain, radiating paresthesias into both legs, numbness, and dull-sharp pain in the mid-back. (R. 265). The clinical findings she cited included a limping gait and muscle spasms. (*Id.*). Dr. Gallo identified the 2011 MRI which showed bulging discs as the laboratory and diagnostic test results which support her diagnoses. (*Id.*). She rated Plaintiff's level of pain as moderately severe to severe, 8 to 9 out of 10, and his level of fatigue as severe, 10 out of 10. (R. 266). Dr. Gallo found that Plaintiff can sit less than one hour in an eight-hour day, stand/walk less than one hour in an eight-hour day, must get up and move around every 15 to 20 minutes and not sit again for 15 minutes, can occasionally carry or lift up to ten pounds, can never push, pull, kneel, bend, stoop, or drive, and should avoid wetness and heights. (R. 266-67, 270). Dr. Gallo checked "Yes" in response to the questions whether

it would be necessary or medically recommended for Plaintiff not to sit or stand/walk continuously in a work setting. (R. 266-67).

Dr. Gallo further indicated that Plaintiff did not have significant limitations in doing repetitive reaching, handling, fingering, or lifting. (R. 267). With respect to Plaintiff's upper extremities, Dr. Gallo stated that Plaintiff is moderately limited in his ability to grasp, turn, and twist objects on both sides and in using his arms for reaching including overhead and markedly limited in using his fingers and hands for fine manipulations. (R. 267-68). According to Dr. Gallo, Plaintiff constantly experiences pain, fatigue, or other symptoms severe enough to interfere with attention and concentration. (R. 269). She further indicated that Plaintiff is not a malingerer. (*Id.*). In addition, Plaintiff is capable of low stress work; he will need to take unscheduled breaks every 15 minutes and rest for 15 minutes before returning to work; he has good days and bad days; and he would be absent from work more than three times a month. (R. 269-70).

In an undated letter with a facsimile date stamp of April 22, 2013, Dr. Gallo wrote that she had been seeing Plaintiff twice a year for multilevel herniated lumbar discs with resulting lumbar radiculopathy since January 3, 2011. (R. 295). She reported that Plaintiff had a motor vehicle accident in 2001 and has had chronic pain since then. (*Id.*). Dr. Gallo stated that Plaintiff "is unable to tolerate narcotics and is force to live with the pain." (*Id.*). Dr. Gallo gave Plaintiff a "poor" prognosis and opined that his "ability to work in any capacity is virtually nil" due to pain. (*Id.*).

On June 5, 2013, consultative examiner Linda Woodard, D.O., reviewed Plaintiff's medical records and determined that there was insufficient medical evidence upon which to evaluate Plaintiff's claim of disability due to Plaintiff's failure to attend two scheduled

consultative examination appointments. (R. 66-83). Martha A. Goodrich, M.D., affirmed this determination on November 29, 2013, finding that a current consultative examination was required to assess Plaintiff's functional condition and allegations of disability. (R. 84-105).

Meanwhile, at a follow-up appointment on September 16, 2013, Plaintiff told Dr. Gallo that Gabapentin was not helping with his pain. (R. 301). Plaintiff reported no change in his pain level since his last visit on April 3, 2013. (*Id.*). Dr. Gallo did not perform a physical exam. (R. 311). She diagnosed Plaintiff's lumbago as unchanged, instructed him to continue taking Gabapentin, and added Vicodin to his medication regimen. (R. 311-12).

### 5.    2014

On February 13, 2014, Landon Hoecker, M.D., evaluated Plaintiff at Town Center Medical Group after Plaintiff was required to change providers due to his insurance. (R. 327). Plaintiff reported having had two herniated discs in his back and a prior discectomy. (*Id.*). Plaintiff's diagnoses included chronic lumbago with medical management when necessary. (R. 329). A week later, on February 20, 2014, Plaintiff returned to Dr. Hoecker to complete a physical examination and reported back pain. (R. 322). Dr. Hoecker's list of chronic problems included lumbago and left lumbar radiculitis. (*Id.*). On musculoskeletal exam, Plaintiff had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. (R. 325).

At Plaintiff's next visit with Dr. Hoecker on March 7, 2014, Plaintiff stated that he was bothered by back pain. (R. 319). Plaintiff told Dr. Hoecker that his last Hydrocodone prescription was ineffective and that he had doubled his dosage of Hydrocodone to

control his pain.  (*Id*.).  Dr. Hoecker added lumbar degenerative disc disease to Plaintiff's list of chronic problems and prescribed Hydrocodone-Acetaminophen for his back pain. (R. 319, 321).  When Plaintiff saw Dr. Hoecker on June 25, 2014, he reported intermittent low back pain and only occasionally using Hydrocodone when necessary.  (R. 315).  On exam, Plaintiff had no motor weakness and balance, gait, and coordination were intact. (R. 317).  Dr. Hoecker's physical examination notes indicate no musculoskeletal problems.  (R. 317-18).  Dr. Hoecker noted that Plaintiff's lumbar degenerative disc disease was stable, and his lumbago was medically managed.  (R. 318).

On October 14, 2014, Plaintiff visited Dr. Denis J. Frank, an internist, complaining of back pain and seeking to have disability forms completed.  (R. 342-43).  Plaintiff stated that he could not work because of lower back pain with some radiation down his lower extremities.  (R. 342).  Dr. Frank referred to Dr. Hoecker's notes and wrote: "former truck driver on chronic opiates had minimal lumbar disc surgery years ago apparently has a failed back surgery syndrome." (*Id*.).  Plaintiff's musculoskeletal exam revealed normal range of motion, reasonable full strength of 5/5 in the upper and lower extremities, and deep tendon reflexes normal on both lower extremities.  (R. 343).  Dr. Frank found problems with neck mobility and an inability to perform straight leg raising beyond 45 degrees bilaterally.  (*Id*.).  Dr. Frank wrote a note stating:  "Forms will be filled out and sent to Lawyer re disability claim.  Suspect some degree of functionality of complaint. Opiate requiring so referred to a pain management specialist." (*Id*.).

Dr. Frank completed a Disability Impairment Questionnaire the same day.  He wrote that he first treated Plaintiff on February 13, 2014, and then continued to provide treatment every three months through October 14, 2014.  (R. 601).  The questionnaire

contains two different handwritings, and Dr. Frank noted that Plaintiff completed parts of the questionnaire. (R. 601-05). For example, Dr. Frank wrote that Plaintiff indicated that he was able to sit less than one hour in an eight-hour workday, stand/walk less than one hour in an eight-hour workday, and after sitting for 30 minutes would need to lie down with his legs elevated for 30 minutes to an hour. (R. 603). Dr. Frank also noted that Plaintiff checked the portion of the form indicating that he was moderately limited in his ability to grasp, turn, and twist objects, use his hand/fingers for fine manipulations, and use his arms for reaching including overhead. (R. 604). It appears that Plaintiff completed the clinical and laboratory findings portion of the form. (R. 601). It also appears that Plaintiff checked "No" in response to the question whether Plaintiff is a malingerer as evidenced by the fact that Dr. Frank apparently then inserted a question mark followed by his initials "(? DJF)" next to the same question. (R. 601). Someone checked the boxes indicating that Plaintiff could occasionally lift ten pounds and that Plaintiff's pain, fatigue, or other symptoms are frequently (from 1/3 to 2/3 of an 8-hour workday) severe enough to interfere with his attention and concentration. (R. 603-04). In addition, the form indicates that Plaintiff needs to take unscheduled breaks to rest every half hour and would miss work more than three times a month. (R. 604-05). At the bottom of the last page of the questionnaire, Dr. Frank wrote that "back pain is difficult objectively to assess" and Plaintiff's lower and upper extremities were "without much weakness." (R. 605). The remainder of Dr. Frank's handwritten notes are cut off on the Court's copy of the questionnaire. (*Id.*).

Plaintiff next saw Dr. Steve Eisenfeld, an anesthesiologist with a specialty in pain medicine, on October 22, 2014, reporting low back pain radiating down his left leg. (R.

385).  Plaintiff described his pain as a constant dull aching sensation in the lowest portion of the low back with radiation into the left buttock.  (*Id.*).  He told Dr. Eisenfeld that his back pain had been tolerable for quite some time but had been worsening over the last three years with no known precipitating trauma.  (*Id.*).  Plaintiff rated his average pain level as a 7 on a 10-point scale with prolonged sitting, standing, or walking as aggravating factors.  (*Id.*).  Dr. Eisenfeld noted that while Plaintiff "does have discomfort, he feels it is tolerable with the use of his current medical regimen."  (R. 387).  Dr. Eisenfeld reviewed the MRI of Plaintiff's lumbar spine on January 11, 2011, indicating that the MRI did not indicate any significant stenosis or nerve root impingement which could account for his radicular symptoms.  (R. 386-87).  He noted, however, that it is "possible he could have continued radicular symptoms due to scarring at the site of surgery and he also may have a facetogenic component to his condition as well."  (R. 387).

On examination, Dr. Eisenfeld noted "rises easily from the seated position," normal tandem gait, able to ambulate on heels and toes, flexion of fingertips just below the knees, moderate restriction in extension, low back pain and left buttock pain during both flexion and extension, flattening of normal lumbar lordosis, and mild tenderness across lumbosacral junction and in the left gluteal region, though Plaintiff had negative sitting straight leg raises bilaterally and full strength of 5/5 in his lower extremities.  (R. 387).  Dr. Eisenfeld diagnosed arthropathy of lumbar facet joint, degeneration of lumbar intervertebral disc, lumbosacral radiculitis, lumbar post-laminectomy syndrome, and pain in the lumbar spine.  (*Id.*). Dr. Eisenfeld continued Plaintiff on Hydrocodone/APAP.  (*Id.*).

On November 2, 2014, Plaintiff underwent an initial psychiatric evaluation at the Arizona Department of Health Services, Division of Behavioral Health Services ("ADHS-

DBHS"). (R. 435-72, 494). Plaintiff was diagnosed with mood disorder, not otherwise specified, and anxiety disorder, not otherwise specified, and began pharmacological treatment. (R. 471-72). A progress note from a December 15, 2014 pharmacological follow-up appointment indicates that Plaintiff denied any orthopedic problems and had normal muscle tone and stable gait. (R. 487).

Dr. Gallo completed a Disability Impairment Questionnaire on November 25, 2014. She stated that she continued to treat Plaintiff every 6 months and most recently examined him in November 2014, but there are no records discussing her treatment or examinations between October 2013 and November 2014. (R. 606). She listed his diagnoses as herniated lumbar discs and lumbar radiculopathy. (*Id.*). In response to a question about the clinical and laboratory findings of Plaintiff's diagnoses, Dr. Gallo cited a limping gait and muscle spasms and referred to the MRI results showing bulging discs. (*Id.*). Plaintiff's primary symptoms include severe low back pain ranging from dull to sharp, radiating paresthesias into both legs, and numbness. (R. 607). Dr. Gallo indicated that Plaintiff is not a malingerer. (R. 606).

It was Dr. Gallo's opinion that Plaintiff could sit and stand/walk less than one hour in an eight-hour workday. (R. 608). She also found that Plaintiff could occasionally lift and carry ten pounds, occasionally grasp, turn, and twist objects, frequently use his hands and fingers for fine manipulations, and occasionally use his arms for reaching including overhead. (R. 608-09.). Further, she suggested that when sitting, Plaintiff would need to get up and move around every 15-20 minutes and not sit again for 15 minutes. (R. 608). Dr. Gallo opined that Plaintiff's symptoms would likely increase in a competitive work environment and that he would frequently experience symptoms severe enough to

interfere with attention and concentration. (R. 609). She indicated that Plaintiff would need to take unscheduled breaks every 30 minutes for 15 minutes. (*Id.*). Dr. Gallo estimated that Plaintiff would be absent from work more than three times a month. (R. 610).

Plaintiff saw Dr. Eisenfeld again on December 1, 2014, complaining of low back pain and left leg pain. (R. 390). Plaintiff said that medication had provided mild relief over the last several years. (*Id.*). On examination, Plaintiff had flattening of normal lumbar lordosis and mild tenderness across lumbosacral junction and in the left gluteal region. (R. 392). A sitting straight leg raise test was negative bilaterally, and Plaintiff had full strength of 5/5 in his lower extremities. (*Id.*). Plaintiff was also able to rise easily from a seated position. (*Id.*). Dr. Eisenfeld added a trial of Lyrica to Plaintiff's other medications and instructed Plaintiff to follow-up in one month. (R. 392-93).

Dr. Eisenfeld completed a Disability Impairment Questionnaire on December 12, 2014. He identified Plaintiff's diagnoses as lumbar spondylosis, lumbar degenerative disc disease, lumbar radiculitis, post-laminectomy syndrome, and lumbago. (R. 430). Plaintiff's primary symptoms included low back and leg pain. (R. 431). As support for his diagnoses, Dr. Eisenfeld cited Plaintiff's history of lumbar surgery, evidence of degenerative changes on the January 2011 MRI, and continuing radicular symptoms after surgery. (R. 430). He indicated that Plaintiff was not a malingerer and found that Plaintiff's ongoing impairments were expected to last at least twelve months. (*Id.*).

Dr. Eisenfeld opined that during an eight-hour workday, Plaintiff was able to sit one hour and stand/walk less than one hour. (R. 432). When sitting, Plaintiff would need to get up and move around 2-3 times an hour and not sit again for 5-10 minutes. (*Id.*). Dr.

Eisenfeld also found that Plaintiff could occasionally lift and carry ten pounds.  (*Id*.).  Dr. Eisenfeld further opined that Plaintiff's pain, fatigue, or other symptoms were frequently severe enough to interfere with attention and concentration (from 1/3 to 2/3 of an 8-hour workday).  (R. 433).  In addition, he stated Plaintiff would need to take unscheduled breaks to rest every hour for 5 to 10 minutes during the day.  (*Id*.).  Dr. Eisenfeld estimated that Plaintiff would be absent from work two to three times a month due to his impairments.  (R. 434).  In Dr. Eisenfeld's opinion, Plaintiff's symptoms and related limitations had existed since December 24, 2010.  *Id*.

**6.    2015**

There is evidence of three progress notes from Plaintiff's pharmacological follow-up appointments at the ADHS-DBHS between January 28, 2015 and July 6, 2015, which each indicate that Plaintiff denied any orthopedic problems and had normal muscle tone and a stable gait.  (R. 473, 481, 643).  Similarly, at a pharmacological follow-up appointment on September 30, 2015, Plaintiff did not report musculoskeletal symptoms. (R. 630).

In the meantime, Plaintiff saw Dr. Eisenfeld on February 26, 2015 for a follow-up and for a medication refill.  (R. 578).  Dr. Eisenfeld noted that Lyrica had been added to Plaintiff's medication regimen and provided noticeable relief.  (R. 580).  Plaintiff felt that Lyrica had "provided approximately 40% relief of his symptoms, decrease in his pain level from a 7/10 to a 4/10."  (R. 578).  On exam, Plaintiff exhibited normal gait.  (R. 580).  Dr. Eisenfeld also observed flattening of normal lumbar lordosis, mild tenderness across lumbosacral junction and in the left gluteal region, no tenderness overlying bilateral SI joints, greater trochanters, ischial tuberosities, negative straight leg raises bilaterally,

muscle strength of 5/5 in the lower extremities, and nonpainful passive range of motion of the bilateral hips. (*Id*.). Dr. Eisenfeld instructed Plaintiff to continue Hydrocodone/APAP and Lyrica and to follow-up in 2 weeks. (R. 581). On May 14, 2015, Plaintiff had another follow-up visit with Dr. Eisenfeld for a medication refill. (R. 582). There are no physical exam findings for this visit. (R. 582-84). Plaintiff was directed to follow-up in three months and continue Hydrocodone/APAP and Lyrica. (R. 584).

## B.    Plaintiff's Testimony

In a Function Report dated May 5, 2013, Plaintiff stated that he experiences "sciatic nerve pain down [his] left leg daily, right leg sometimes.  Dull sharp back pain, left buttocks, left leg, right back across back daily." (R. 281).  Plaintiff reported that his typical day starts at 4 am after going to bed at midnight. (R. 219).  He can sit for an hour before having to stand and walk for a half an hour to relieve his back pain. (*Id*.).  He sometimes naps for two hours in the afternoon. (*Id*.).  He spends most of his time watching TV or reading. (R. 222).  He stated that he gets dressed slowly while sitting down, cannot bend over while bathing, and crawls to the bathroom in the middle of the night because of back pain. (R. 220).  Plaintiff reported being able to prepare his own simple meals, do laundry and indoor cleaning, shop two to three times a week for groceries, and drive for a half an hour to an hour. (R. 221).  Plaintiff indicated that because of back pain, he has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, concentrating, and using his hands. (R. 223).  Plaintiff reported that he can walk for a half an hour to an hour before needing to rest for 15 to 30 minutes. (*Id*.).

At the June 23, 2015 hearing before the ALJ, Plaintiff testified that he last worked as a truck driver for five to six months but had to quit after a couple of injuries on the job

caused back problems and chronic back pain. (R. 52-53). He described lower back pain that radiated down his left side and occasionally up his right side. (R. 56). Plaintiff testified that because of his back pain, he needs to alternate sitting and standing every 20 to 30 minutes for three to four hours and then he needs to lie down. (R. 55). Plaintiff indicated that he cannot do any household chores. (*Id.*). A friend of his mother cleans his apartment every six weeks. (*Id.*).

## C.    **Vocational Expert's Testimony**

John McGowan testified at the hearing as a VE. (R. 58). Mr. McGowan testified that Plaintiff's past work was as a bartender (semi-skilled, light work), food service supervisor (skilled, light work), and restaurant host (skilled, light work). (R. 60-62). The ALJ asked him to consider a hypothetical person of Plaintiff's age, education, and past work experience who can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand, walk, and sit for up to 6 hours in an 8-hour workday; occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; occasionally stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold and unprotected heights. (R. 59-60). The VE testified that such a person could perform Plaintiff's past work as a bartender, food service supervisor, and restaurant host. (R. 60-62). In response to Plaintiff's counsel's questioning, the VE testified that a person who missed work two days a month would be precluded from all work. (R. 63).

## D.    **Administrative Law Judge's Decision**

The ALJ found that Plaintiff's status-post lumbar surgery is a severe impairment, but that it does not alone or in combination with other non-severe impairments meet or medically equal a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. (R.

34-35). After reviewing the medical record and testimonial evidence, the ALJ determined that Plaintiff has the RFC to perform light work, except that he can occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; never climb ropes, ladders or scaffolds; and should avoid concentrated exposure to extreme cold and unprotected heights. (R. 37).

In reaching this conclusion, the ALJ afforded little weight to Dr. Gallo's opinion; little weight to Dr. Eisenfeld's opinion; and very little weight to Dr. Frank's opinion. (R. 39-40). With respect to Plaintiff's testimony, the ALJ found Plaintiff less than fully credible given his receipt of unemployment benefits during the same time he alleged he was totally disabled, his failure to attend a consultative examination, and his representation to health care professionals that he had herniated discs in his back "when the objective evidence was contrary." (R. 38-39). Based on these findings, the ALJ accepted the VE's testimony that Plaintiff can perform his past relevant work as a bartender, food service supervisor, and restaurant host. The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act and is not entitled to benefits. (R. 41-42).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923,

926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The Court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[2] A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result or which has lasted or can be

---

[2]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry, which involves analyzing "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). "The claimant bears the burden of proof in each of the first four steps." *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F.Supp.2d 1131, 1139-40 (N.D. Ill. 2012).

## C. Analysis

Plaintiff argues that the ALJ's decision must be reversed because he (1) failed to properly weigh the medical opinion evidence from Dr. Gallo, Dr. Eisenfeld, and Dr. Frank; (2) failed to identify an evidentiary basis that supported his finding that Plaintiff retained the RFC to perform a limited range of light work after rejecting the opinions of Plaintiff's treating physicians; and (3) erred in evaluating Plaintiff's statements regarding the severity of his symptoms.

### 1. Treating Physicians' Opinions

A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that this rule governs claims filed before March 27, 2017, *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017)). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and then determine what weight to give it considering "'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell v. Astrue*, 627 F.3d 299, 308 (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)); 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

### a. Dr. Gallo's Opinions

Dr. Gallo opined in an undated letter that Plaintiff's pain and disability had been ongoing for many years and his prognosis was poor. (R. 295). Dr. Gallo stated that Plaintiff's diagnoses included multilevel herniated discs with resulting lumbar radiculopathy and Plaintiff "walks with a limp due to the muscle spasms associated with his back pain." (*Id.*). The ALJ offered three reasons for giving "little weight" to this opinion: (1) Dr. Gallo's statement as to disability is an issue reserved to the Commissioner; (2) Dr. Gallo's letter does not contain a function by function analysis of Plaintiff's abilities; and (3) the clinical examination findings in the record do not support a finding of disability.

The ALJ properly determined that no deference need be given to a physician's opinion that a claimant is disabled or unable to work as that determination is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will

determine that you are disabled.'"); *Stevenson v. Colvin*, 654 Fed. Appx. 848, 852-53 (7th Cir. 2016). Second, the ALJ reasonably concluded that Dr. Gallo's assessment was not entitled to controlling weight because her letter did not provide any specific work-related functional limitations related to Plaintiff's back impairment. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("Given that Dr. Lloyd failed to venture an opinion as to the extent of Books' limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best."). In declining to give controlling weight to Dr. Gallo's opinion, the ALJ also fairly relied on the conflict between the medical evidence and Dr. Gallo's finding of disability. By way of example, the ALJ noted that when Plaintiff presented to the emergency room in 2010, he denied numbness, weakness, or tingling to the lower extremities and described the maximum severity of his pain as "moderate." (R. 38). The ALJ observed that while Plaintiff's MRI noted degenerative changes, it also documented "the absence of nerve root impingement." (R. 39). The ALJ noted that Dr. Hoecker observed in June 2014 that Plaintiff's degenerative disc disease was stable, and his lumbago was medically managed. (R. 38). The ALJ also cited findings from Dr. Eisenfeld. (*Id.*). These findings include Dr. Eisenfeld's notes in October 2014 that Plaintiff reported "some discomfort" from his back condition but also that Plaintiff felt it was tolerable with the use of his current medical regime; clinical examination findings from Dr. Eisenfeld in October 2014 that Plaintiff had normal strength and negative straight leg raise bilaterally; and Dr. Eisenfeld's notes from February 25, 2015 that the addition of Lyrica to Plaintiff's medication regime provided noticeable relief. (*Id.*). The ALJ's reliance on the conflict between the medical evidence and Dr. Gallo's finding of disability is a valid reason for refusing to assign controlling weight to Dr. Gallo's opinion.

The ALJ also declined to afford controlling weight to Dr. Gallo's November 25, 2014 Disability Impairment Questionnaire in which she opined that Plaintiff could lift and/or carry up to ten pounds, could sit, stand and/or walk for less than one hour in an eight-hour workday, would require a sit/stand option, would have grasping, reaching, handling, and fingering limitations, would require frequent unscheduled breaks and would miss more than three days of work a month.  (R. 606-10).  The ALJ explained that he failed to give this opinion controlling weight because the extent of the limitations was unsupported by and inconsistent with the evidence.  (R. 39).  This explanation is supported by substantial evidence.  As noted above in this opinion, the ALJ identified numerous ways in which Dr. Gallo's disability opinion is not in line with the 2011 MRI and the evidence and clinical examinations from Dr. Hoecker and Dr. Eisenfeld.  (R. 38).  The ALJ also found Dr. Gallo's opinion unreliable because she indicated the presence of herniated discs, "which misrepresents the findings of the MRI." (R. 39).  The ALJ correctly observed that the 2011 MRI report does not use the words "herniated discs."  (R. 291-92).  Additionally, the ALJ did not give controlling weight to Dr. Gallo's opinion because her limitations on reaching, handling, and fingering are not supported by any physical impairment in the record.  (R. 39.).  Plaintiff does not challenge this specific finding.

### b.    Dr. Eisenfeld's Opinions

Plaintiff next objects to the ALJ's refusal to assign controlling weight to Dr. Eisenfeld's opinion that Plaintiff could occasionally lift and carry up to ten pounds, never lift and carry more than ten pounds, could sit one hour in an eight-hour workday, could stand and/or walk less than one hour in an eight-hour workday, would require a sit/stand option, and would miss two to three days of work a month due to his symptoms.  (R. 40,

430-34). In reaching this conclusion, the ALJ reasoned that the opinion was inconsistent with Dr. Eisenfeld's own treatment notes which showed full motor strength in the lower extremities, negative straight leg raise test bilaterally, normal sensory examination, and the absence of atrophy. (R. 40). The ALJ found that Dr. Eisenfeld's opinion that Plaintiff could not work was also inconsistent with his treatment notes which indicate that Plaintiff's discomfort is managed with medication. (*Id.*).

In addition, the ALJ declined to give controlling weight to Dr. Eisenfeld's opinion because Plaintiff's attorney pre-typed the alleged onset date of December 24, 2011, which corresponds to the date Plaintiff states he became disabled, on the questionnaire before he provided it to Dr. Eisenfeld. (R. 40, 434). This justification for denying controlling weight to Dr. Eisenfeld's opinion is lacking. Although Plaintiff's attorney pre-typed the alleged onset date of December 24, 2010, the questionnaire expressly asked if Dr. Eisenfeld agreed with this onset date and offered Dr. Eisenfeld the option to disagree with alleged onset date and indicate a different onset date. (R. 434). If the medical record showed that Plaintiff's attorney filled out the questionnaire, the ALJ might properly discount the opinion. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). But here Dr. Eisenfeld completed the questionnaire and specifically agreed with the December 24, 2010 onset date. Under these circumstances, the fact that the attorney pre-typed the alleged onset date is not a legitimate reason to discount the entire medical opinion. Notwithstanding this error, the ALJ's decision not to give controlling weight to Dr. Eisenfeld's opinion is supported because the ALJ reasonably found his opinion inconsistent with other substantial evidence in the record, specifically his own treatment notes.

### c. Dr. Frank's Opinions

Plaintiff also argues that the ALJ erred in declining to afford controlling weight to the October 14, 2014 opinion of Dr. Frank. The questionnaire provided by Dr. Frank states that Plaintiff can occasionally lift and carry up to ten pounds, can sit for less than one hour in an eight-hour workday, can stand and/or walk for less than one hour in an eight-hour workday, requires a sit/stand option, and has significant limitations in reaching, handling, and fingering. (R. 603-04). In addition, Plaintiff requires unscheduled breaks every half-hour and would be absent from work more than three times a month. (R. 604-05). The ALJ failed to assign controlling weight to Dr. Frank's opinion for largely for the same reason he cited in assessing the opinions of Drs. Gallo and Eisenfeld, namely, the extreme limitations are not supported by the medical evidence. (R. 40). The ALJ cited to Dr. Eisenfeld's records reflecting noticeable improvement to Plaintiff's symptoms with Lyrica and findings from Dr. Eisenfeld that Plaintiff had negative straight leg raise test bilaterally and full motor strength in his lower extremities. (*Id.*). As with Drs. Gallo's and Eisenfeld's opinions, inconsistency with other substantial evidence in the record was a valid reason, supported by substantial evidence, to refuse to assign controlling weight to Dr. Frank's October 2014 opinion.[3]

In sum, the ALJ's analysis of Drs. Gallo's, Eisenfeld's, and Frank's opinions provides sufficient reasons for declining to give controlling weight to the opinions, and his determination in that regard is supported by substantial evidence.

---

[3] The Court also notes that the ALJ referenced Plaintiff's daily activities of living alone, performing household chores, and attending to his personal needs with mild limitation when weighting Dr. Frank's opinion. (R. 40). For the reasons discussed in the credibility discussion that follows, the ALJ's analysis of Plaintiff's daily activities is deficient and the related findings are not supported by substantial evidence.

### d. Weighting of Medical Opinions

Plaintiff next claims that even if the medical opinions from his treating physicians are not entitled to controlling weight, the ALJ erred by failing to apply the regulatory factors in evaluating the weight to give the opinions. After declining to afford the treating physicians' opinions controlling weight, the ALJ was required to address what weight the opinions merit considering the regulatory factors. *See* SSR 96-2p (treating source opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527.").[4] The Court agrees that the ALJ failed to address several of the regulatory factors.

The ALJ justified his decision not to give much weight to the treating physicians' opinions by noting that the MRI did not show nerve root impingement and asserting that the opinions were unsupported and inconsistent with normal findings by Dr. Eisenfeld and other evidence in the record which indicated that Plaintiff's back impairment was stable, medically managed, tolerable with his medical regime, and improved on Lyrica. (R. 38-40). These justifications generally address the supportability and consistency of Drs. Gallo's, Eisenfeld's, and Frank's opinions, which are two of the checklist factors.

The Commissioner does not address the ALJ's lack of analysis regarding the remaining factors. Other than acknowledging that Drs. Gallo, Eisenfeld, and Frank were Plaintiff's treating physicians, the ALJ did not discuss the nature and extent of the treatment relationships, the frequency of examinations, or whether the doctors had a relevant specialty. The ALJ did not mention the fact that Dr. Eisenfeld is a board-certified

---

[4]     The SSA has rescinded SSR 96-2p in connection with its new rules governing the analysis of treating physicians' opinions, but that recession is effective only for claims filed on or after March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 3928298 (Mar. 27, 2017).

anesthesiology specializing in pain management. (R. 388). Nor did the ALJ acknowledge that Dr. Gallo reported in a questionnaire on November 25, 2014 that he had treated Plaintiff for back issues every six months from December 2010 through November 2014 (R. 606).[5] Likewise, when rejecting Dr. Gallo's, Dr. Eisenfeld's, and Dr. Frank's opinions, the ALJ failed to discuss the fact that their separate opinions were not only consistent with each other, but uncontradicted by any other medical opinions in the record. The ALJ was required to address these factors and articulate how they impacted his decision. *Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) ("ALJs must evaluate a treating physician's noncontrolling opinion by considering the treating relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician."); *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (ALJs are required to "sufficiently account[] for the factors in 20 C.F.R. § 404.1527."). Since the ALJ does not indicate that he evaluated these factors, the Court is unable to assess whether the ALJ properly assigned minimal weight to the treating physicians' opinions. Accordingly, a remand is necessary for the ALJ to properly analyze and explain the weight to be afforded the opinions of Dr. Gallo, Dr. Eisenfeld, and Dr. Frank according to the regulatory factors. *Campbell*, 627 F.3d 308 (remanding where the ALJ did "not explicitly address the checklist of factors" listed in 20 C.F.R. §§ 404.1527, 404.416.927 as applied to the medical opinion evidence).

### 2.    RFC Determination

Plaintiff argues that the ALJ's RFC assessment finding him capable of a limited range of light work is flawed because it lacks any evidentiary basis. A claimant's RFC is

---

[5]    Treatment records from Dr. Gallo (at Scottsdale Primary Care) only reflect prior visits on January 3, 2011, April 16, 2012, April 13, 2013, and September 16, 2013. (R. 298-312).

the maximum work he can perform despite his limitations. *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (citations omitted).

Plaintiff's RFC challenge is based on the fact that the ALJ rejected all the treating physicians' opinions of record, which left the ALJ without an adequate basis to assess the effect of Plaintiff's back impairment. In this sense, Plaintiff says the ALJ created an "evidentiary deficit" that he improperly filled with his own lay assessment of the medical evidence. The ALJ gave little weight to the opinions from Drs. Gallo and Eisenfeld and very little weight to the opinion from Dr. Frank. That left the opinions from the state agency consultants, both of whom found that there was insufficient medical evidence in the record to assess Plaintiff's degree of physical limitations. There are no other medical opinions on the severity of Plaintiff's back impairment or the limitations Plaintiff's back impairment may have caused. Without any medical functional assessment of Plaintiff's physical capabilities during the relevant time, there was an evidentiary gap. Nevertheless, the ALJ found that Plaintiff's back condition was a severe impairment and limited him to never climbing ropes, ladders or scaffolds and only occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling. (R. 34, 37). He did not explain, however, why the evidence supported those limitations but still allowed Plaintiff to stand or walk for 6 out of 8 hours every workday with occasional lifting of 20 pounds and frequent lifting of 10 pounds.

The ALJ does point to the absence of nerve root impingement, some normal examination findings, and references describing Plaintiff's back condition as stable, medically managed, tolerable with the use of his current medical regime, and improved on Lyrica, but the ALJ is not a medical expert and cannot interpret medical evidence. As the Seventh Circuit has made clear, "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert*, 896 F.3d at 774. "No physician testified—no medical records [re]vealed—that [Plaintiff] has the residual functional capacity ascribed to him by the administrative law judge." *Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013). This is no medical assessment which supports a finding that Plaintiff can perform the standing, walking, and lifting requirements of light work five days per week. Without any medical expertise or other opinion evidence, it is not clear how the ALJ determined that the findings he identified in his decision support his RFC assessment that Plaintiff can stand or walk for six hours as opposed to five hours or lift ten pounds frequently as opposed to occasionally. *Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010) (where the ALJ's rejection of medical opinions left an "evidentiary deficit," it was "unclear . . . how the ALJ concluded that [the plaintiff] could stand or walk for six hours a day.").

The ALJ's opinion also does not reflect an understanding that a person can be characterized as "stable" and medically improving and still be incapable of performing light work. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that [one] is capable of doing light work."); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter

the workforce."). It is true that Dr. Hoecker stated that Plaintiff's degenerative disc disease was "stable" and his lumbago was "medically managed," but none of Dr. Hoecker's notes address Plaintiff's ability to perform light work, specifically Plaintiff's ability to walk or stand six hours of an eight-hour workday and his ability to lift or carry any weight. *Murphy*, 759 F.3d at 818. For these reasons, the ALJ erred by offering his own medical opinion that the treatment records and medical findings demonstrate an ability to perform a limited range of light work. *Suide*, 371 Fed. Appx. at 690 (an ALJ is "not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record."). Thus, the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence, and a remand on this basis is necessary. On remand, the ALJ must articulate sufficient support for his RFC determination.

### 3. Credibility Analysis

Plaintiff finally argues that the ALJ erred in finding his statements about the limiting effects of his symptoms "not fully credible." (R. 38). In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by objective medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."[6] *Arnold*, 473 F.3d at 823; s*ee also* 20 C.F.R. §§ 404.1529,

---

[6]     SSR 16-3p does not apply to this appeal since the ALJ's decision is dated August 18, 2015. *See* Notice of Social Security Ruling (SSR), 82 FR 49462-03, 2017 WL 4790249, at n.27 (Oct. 25, 2017) (clarifying that SSR 16-3p only applies when ALJs "make determinations on or after March 28, 2016.").

416.929.  A "lack of medical evidence alone is an insufficient reason to discredit testimony."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong."  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

In addition to a lack of support in the medical record, the ALJ explained that he did not find Plaintiff's testimony fully credible for several reasons.  The ALJ's first reason for discounting Plaintiff's credibility was based on his receipt of unemployment benefits.  (R. 39).  The ALJ reasoned that Plaintiff's application for and receipt of these benefits indicated that he was "ready, willing, and able to work."  (*Id.*).  The Seventh Circuit has stated that "a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work" is a factor to consider in assessing a claimant's credibility.  *Schmidt v. Barnhart*, 395 F.3d at 746.  However, "a person who is not certain whether he will qualify for Social Security disability surely has, *and should have*, a strong incentive to keep looking for work and to pursue employment compensation as an interim source of income."  *Lambert*, 896 F.3d at 779 (emphasis in original).  Therefore, "[a]n ALJ should not discount a claimant's credibility based on an application for unemployment compensation without taking these incentives and pressures into account."  *Id.*

Although the ALJ asked Plaintiff if he received unemployment benefits, he did not explore the circumstances surrounding Plaintiff's application for unemployment benefits.  (R. 52-53).  The ALJ was required to evaluate the facts regarding the circumstances of Plaintiff's unemployment application and to adequately articulate his conclusions.  *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (drawing an adverse inference

from a claimant's receipt of unemployment benefits must be done "with significant care and circumspection" after "[a]ll the surrounding facts [have been] be carefully considered."). The ALJ erred in failing to address the full context of Plaintiff's application for unemployment compensation. Thus, if the ALJ continues to rely on Plaintiff's receipt of unemployment benefits in evaluating Plaintiff's credibility on remand, he should question Plaintiff on this issue and consider the facts surrounding Plaintiff's application.

Second, the ALJ relied on Plaintiff's failure to attend a scheduled consultative examination to discount his credibility in seeking disability benefits. (R. 39). The ALJ stated that "claimant also failed to attend a consultative examination which limited the agency's ability to obtain information." (*Id.*). A claimant who applies for social security disability benefits may be found not disabled, absent a "good reason for failing or refusing to take part in a consultative examination or test which we arranged for you...." 20 C.F.R. §§ 404.1518(a), 416.918(a). Good reasons for failure to appear at a consultative examination include illness on the date of the scheduled examination, not receiving timely notice or any notice of the examination, being furnished incorrect or incomplete information, or having had a death or serious illness occur in the claimant's immediate family. 20 C.F.R. §§ 404.1518(b), 416.918(b).

The Commissioner acknowledges that "there is no evidence in the record that [Plaintiff] was notified of the examination or if he was contacted to determine why he did not attend." (Doc. 23, at 9). In addition, the ALJ did not ask Plaintiff at the hearing whether he had any reason for failing to attend the consultative examination. The ALJ's lack of discussion concerning any reasons for Plaintiff's failure to attend the consultative examination undermines the credibility determination. On remand, the ALJ should ask

Plaintiff whether there is a good reason for his failure to attend the consultative examination before drawing an adverse inference regarding his credibility.

The ALJ also found Plaintiff not entirely credible based on his conclusion that "Plaintiff informed health care professionals that he had herniated discs in his back when the objective evidence was contrary." (R. 39). The ALJ explained that "[w]hile this may not have been an intentional attempt to exaggerate, it does demonstrate a lack of reliability in the representations made by the claimant." (*Id.*). The ALJ does not cite to any evidence in the record to support his conclusion, making it unclear what evidence he relied on. The record establishes that Plaintiff reported to Drs. Gallo, Eisenfeld, Frank, and Hoecker that he had a history of a herniated lumbar disc with a discectomy in 2002. (R. 316, 320, 323, 328, 342, 385). In fact, the ALJ noted that Plaintiff reported to Dr. Gallo "a history of a herniated disc in 2003 for which [he] underwent surgery." (R. 35). Under these facts, it is not clear how the ALJ determined from the record that Plaintiff informed his doctors that he continues to suffer from herniated discs. As such, the Court cannot conclude that this finding is supported by substantial evidence. On remand, if the ALJ again discounts Plaintiff's credibility based on a perceived lack of reliability due to his having informed his doctors that he currently had herniated discs, the ALJ should support his finding with specific references to the record.

Lastly, Plaintiff objects that the ALJ erred by equating his ability to do some minimal activities of daily living with an ability to engage in full-time work. With respect to Plaintiff's daily activities, the ALJ noted that Plaintiff "lives alone, can perform household chores and can attend to his personal need with mild limitation." (R. 40). It is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility if it is done "with

care" because "a person's ability to perform daily activities, especially if th[ey] can be done with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). This means "[a]n ALJ cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 563 (7th Cir. 2009).

The Court agrees that the ALJ erred by equating Plaintiff's ability to do limited activities of daily living with an ability to sustain full-time work. None of the activities the ALJ cited support his conclusion that Plaintiff would be able to spend six hours out of each eight hour workday standing or walking as indicated in the RFC *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (finding that claimant's limited ability to care for her mother "lend[s] no support to the conclusion that she would be able to spend six hours a day, every day, on her feet working."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (noting "critical differences between activities of daily living and activities in a full-time job."). In addition, the ALJ ignored testimony by Plaintiff indicating that he needs to alternate between sitting and standing every 20 to 30 minutes for three to four hours and then needs to lie down to control pain. (R. 55). While the ALJ mentioned that by the time of the hearing on June 23, 2015, Plaintiff could no longer do chores around the house and a friend of his mother cleaned his apartment every six weeks, he did not explain his view of this testimony. (R. 38, 56). The ALJ's failure to explain why he found these qualifications in performing activities of daily living unpersuasive constitutes reversible error. *See Pratt v. Colvin*, 2014 WL 1612857, at *8-10 (N.D. Ill. Apr. 16, 2014) (ALJ who noted that a claimant was able to "cook, clean, and do laundry" but did not consider her

significant limitations in performing those activities failed to "build a logical bridge between the evidence and his conclusion that she was not credible.").

Based on the foregoing, the ALJ's credibility determination is flawed and must be reconsidered on remand.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 14) is granted and Defendant's Motion for Summary Judgment (Doc. 22) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

ENTER:

Dated: January 4, 2019

SHEILA FINNEGAN
United States Magistrate Judge